**2010 BNH 031**     Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.
_____

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                                              Bk. No. 10-10086-JMD
                                                                                                    Chapter 13
Raymond U. Roy,
            Debtor


*Raymond J. DiLucci, Esq.*
*Raymond J. DiLucci, P.A.*
*Concord, New Hampshire*
*Attorney for Debtor*

*Lizabeth M. MacDonald, Esq.*
*Donahue, Tucker & Ciandella, PLLC*
*Exeter, New Hampshire*
*Attorney for People's United Bank*


## MEMORANDUM OPINION

### I.  INTRODUCTION

The Court has before it three motions filed by the Debtor seeking to determine the secured status of mortgages on the same parcel of real estate and to void wholly unsecured liens under §§ 506(a) and 1322(b)(2) of the Bankruptcy Code.  The parcel of real estate involves the property known as 1 Rockingham Street, Exeter, New Hampshire (the "Property").  The three motions pertain to the following liens: (1) the first and second mortgage liens held by People's United Bank (the "Bank"), successor to Ocean Bank (Doc. No. 74) (the "Bank Motion"); (2) the judicial attachment held by Boyd Hines (Doc. No. 75) (the "Hines Motion"); and the attachment lien held by De Lage Landen Financial Services (Doc. No. 76) (the "Landen Motion").

The Court held an evidentiary hearing on November 1 and 16, 2010 at which the parties presented appraisal and other evidence. At the commencement of the hearing, the parties agreed, for the purpose of ruling on the three motions, that the amounts of the liens in question are:

| | | |
|---|---|---:|
| 1st lien | Bank Mortgage | $444,000 |
| 2d lien | Bank Mortgage | $198,000 |
| 3d lien | Landen Attachment | $ 58,500 |
| 4th lien | Hines Attachment | $ 23,300 |
| | Total | $723,800 |

Only the Debtor and the Bank presented appraisal evidence at the hearing. At the conclusion of the hearing, the Court took the three motions under submission.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II.  FACTS

### A.  The Property

The Property is a 2.49 acre parcel of land located at 1 Rockingham Street in Exeter, New Hampshire. It is improved with 46,017 square feet of wood frame office, light industrial and storage buildings. The Property is a multi-tenant parcel located in an above average industrial location, but in below average condition.

#### 1.  The Debtor's Appraisal Evidence

The Debtor entered into evidence an appraisal report prepared by The Stanhope Group LLC dated April 29, 2010 and the testimony of Peter Stanhope. Stanhope offered his expert opinion that the value of the Property as of April 29, 2010 was $120,000. Stanhope testified that

2

because of the age, poor condition, asbestos and site contamination, the Property would not be attractive to an investor in its current configuration as an income generating property and that its highest and best use would be as land to be used for multi-family housing.  The primary reason for his conclusion was that the high costs to renovate and clean up the Property could not be supported by the market rents.  He concluded that an investor would buy the Property and continue to derive income from it in its current condition for up to five years before demolition of the buildings, site clean up and reuse of the land.

     He examined four comparable land sales and a fifth comparable listing to determine his estimate of the value of the Property as land only.  He considered all of the comparable parcels to be located in locations similar to the Property.  The mean and median price per acre of the five comparable parcels was $95,966 and $93,094, respectively.  Because he viewed the Property as inferior to all of the comparable parcels, he used a value of $85,000 per acre for the 2.49 acre Property to determine a gross land value of $211,650, which he rounded to $212,000.  He then estimated the pro forma net income from the rental of the Property in its current condition as $35,278 per year.  After application of a discount rate of 8.53%, he determined that the present value of the income stream for five years was $150,758.  Based on consultations with a demolition contractor and an environmental remediation firm, he determined that the cost of demolition and remediation would be $105,000 and $150,000, respectively, or a total of $267,750 after five years.  After factoring in assumptions about increased land values over five years and sales costs, he determined that the net proceeds on sale after five years would be ($47,800), which has a net present value of ($31,745).  After netting this negative value with the net present value of the five year income stream, he derived a value of $119,013 which he rounded to $120,000 (the "Stanhope Value").

### 2. The Bank's Appraisal Evidence

The Bank entered into evidence an appraisal report prepared by Brian W. White dated September 17, 2010 and the testimony of Brian White. White offered his expert opinion that the value of the Property as of January 13, 2010 was $525,000. White determined that the highest and best use for the Property was as improved for continued use as light industrial space. White examined five parcels of land that he determined were comparable to the Property. The selling prices for the five parcels ranged from $117,857 to $258,333 per acre. He gave greater weight to two of the comparable sales that had the lowest net and gross price adjustments to determine that the value of the Property as land was $175,000 per acre or $423,500 for the 2.42 usable acres that comprise the Property. He estimated a cost of $70,000 to demolish and remove the existing buildings resulting in a current market value for the Property, as land, of $355,000. White made no adjustment for asbestos removal or site remediation because he had no report or estimate, which he viewed as sufficiently reliable, to support the cost of such remediation. He recognized that his valuation assumes no environmental remediation costs which he identified as an "extraordinary assumption."

White also examined six comparable sales of improved properties. He gave greater weight to three of the six comparable sales due to the low number of adjustments made by him and determined that the value of the Property was $12.50 per square foot or $575,213 for 46,017 square feet. White recognized that repair and maintenance of a portion of several roof, soffit and fascia areas on the Property were necessary at an estimated cost of $50,000. After factoring in the repair costs he determined that the Property had a value, as improved, of $525,000.

**III.  DISCUSSION**

    **A.  The Legal Standard**

The question of valuing property in the context of confirmation of a plan of reorganization is a fact-sensitive one; valuation is done on a case-by-case basis.  See Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship), 116 F.3d 790, 799 (5th Cir. 1997); In re Melgar Enter., Inc., 151 B.R. 34, 39 (Bankr. E.D.N.Y. 1993) ("[V]aluation is to be determined on a case-by-case basis.").  However, where a debtor proposes to retain property under a plan of reorganization, the Court must value the property in light of the proposed post-bankruptcy use of the property.  Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 962 (1997); Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.), 50 F.3d 72, 75 (1st Cir. 1995).  As a general rule, that value will be the replacement, or fair market value, of the property valued in a manner consistent with the debtor's use of the property.  Rash, 520 U.S. at 963 (citing Winthrop, 50 F.3d at 75).  Finally, it is generally agreed that the property should be valued as it stands at the time of the proceeding.  See, e.g., In re Tamarack Trail Co., 23 B.R. 3, 5-6 (Bankr. S.D. Ohio 1982).

    **B.  The Appraisal Evidence**

In this case, the Debtor is proposing to retain the Property.  Accordingly, the fair market value of the Property, without any deduction for costs of sale, but with adjustments for expenses necessary to hold or realize the value of the Property, in light of its highest and best use, is the proper measure of value.  Rash, 520 U.S. at 960; Winthrop, 50 F.3d at 75-76 ("Our approach allows the bankruptcy court, using its informed discretion and applying historic principles of equity, to adopt in each case the valuation method that is fairest given the prevailing circumstances.").

The ultimate conclusions of the two appraisers are materially different. Stanhope valued the Property at $120,000 while White valued it at $525,000, a difference of more than 430%. Despite the magnitude of the difference, a closer examination of their respective reports and testimony reveals some common ground. Both appraisers testified that the Property is currently in poor condition  Stanhope's opinion of the highest and best use of the Property was based upon the condition of the Property and his view that the cost to remediate the asbestos and environmental problems on the Property, plus physical repairs, would exceed what market rents could support or justify. Although White was aware of the potential need for environmental remediation, he did not make any adjustment for such potential need because he did not have what he viewed as reliable information on the costs of remediation. He also assumed that repairs of $50,000 would be necessary simply to improve the Property to below average condition.

### 1. The Value of the Property as Land

Stanhope valued the Property as raw land at $212,000, plus a discounted cash flow from income over five years of $150,728, for a total of $362,728, before any deductions for costs of sale, demolition or environmental remediation. White valued the Property's land at $423,500, before demolition or environmental remediation. Therefore, the two appraisers unadjusted value for the Property as raw land differs by only $60,772, or 16.7%.

However, the adjustments by the two appraisers differ significantly. Stanhope estimates the cost of demolition at $105,000, while White estimates the cost at $70,000. Interestingly, both appraisers base their costs on estimates from the same demolition contractor, Lee Danley of Danley Demolition, Inc. Stanhope had an estimate of $95,000 plus $10,000 for removal and disposal of paving. White had an estimate of $65,000 for the existing improvements with the exception of the office building, which White estimated would add $5,000 in costs. Since the

appraisers utilized the identical source for their estimates, and neither party presented any evidence on the assumptions behind those estimates, the Court shall take the average of the estimates for removal of the improvements plus the estimate for the paving as the cost of demolition, (($95,000 + $70,000)/2 + $10,000), or $92,500.

Both appraisers recognize that an issue regarding environmental remediation exists on the Property, but disagree how to account for it. White found no reliable evidence for the costs of remediation and, therefore, did not account for any remediation costs. Stanhope obtained an estimate from an environmental remediation company of $130,000 to $150,000. The estimate was based on a preliminary survey (Phase I Environmental Site Assessment) for removal and disposal of asbestos, lead paint, and certain hydrocarbons. The estimate used by Stanhope indicates that lead paint remediation would be unnecessary if the buildings were razed and removed. The biggest portion of the cost estimate is $110,000 to $130,000 to cover and cap soils with hydrocarbon contamination. However, it is clear from the estimate used by Stanhope that the necessity and extent of remediation for hydrocarbons is uncertain at this time. The cost for asbestos removal is estimated at $20,000 to $25,000.

The Court believes that the issue of potential environmental remediation would have a material impact on the value of the Property and that until such costs can be ascertained with greater certainty, the Property may be unmarketable. However, the Court needs to make the best possible determination of value based on the evidence available. The Court finds the need for and the estimated costs of asbestos removal to be sufficiently certain to include it as a factor in the valuation of the Property, even for a short term use of the Property. However, the evidence in the record before the Court is insufficient to establish the necessity or extent of any remediation for hydrocarbon contaminated soils. Accordingly, the Court shall deduct $25,000

from each appraisal of the raw land value for asbestos remediation, but shall not include costs for lead paint removal, as it is unnecessary in a raw land valuation, or for hydrocarbon remediation, as it is speculative and uncertain on the record before the Court.

After the adjustments above, the raw land valuations by each appraiser are:

|  | Stanhope | White |
|---|---|---|
| Gross Land Value | $362,728 | $423,500 |
| Less: Demolition Costs | $92,500 | $92,500 |
| Asbestos Removal | $25,000 | $25,000 |
| Net Land Value | $245,228 | $306,000 |

Both appraisers had difficulty finding good comparative land sales due to a diminished real estate market and the somewhat unique in-town location lacking frontage on a road with a significant traffic count. The Court finds that Stanhope's comparable land sales were more representative than White's comparable sales. White's comparable sales all had frontage on or visibility from high traffic roads, a characteristic the Property lacks. Accordingly, the Court shall give double weight to Stanhope's net land value, as computed above. For the reasons discussed above, the Court finds the value of the Property as raw land to be $265,500.[1]

### 3. The Value of the Property as Improved

Stanhope found that market rents would not support his rough estimates for environmental remediation and building renovations. Therefore he concluded that the highest and best use for the Property was as raw land. White used a comparable sales approach to determine a per foot valuation for the improvements on the Property and determined that the highest and best use for the Property was rental of the current improvements after some

---

[1] ((2 x $245,228) + $306,000)/3 = $265,485, rounded to $265,500.

renovation. Based on his sales comparison analysis, he valued the Property at $575,000, with a reduction of $50,000 for deferred maintenance, for a net value of $525,000. White encountered difficulty finding sales of comparable parcels even within two years of his appraisal date. His report identifies six comparable sales which ranged in value from $6.84 to $23.04 per square foot. White gave increased weight to three of the six comparable sales because in his analysis they had smaller adjustments and determined a value of $12.50 per square foot for the Property. The Court finds his comparable sales to be significantly different than the Property. While all six of his comparable sales have uses similar to the Property, only one of them has similar wood frame construction. The other five are constructed from some combination of steel, brick and concrete. The only wood frame comparable sale was sold in the middle of 2006 and was evaluated by White as in below average condition. The Court notes that White is of the opinion that if $50,000 of roof renovations were completed on the Property, it would still be in below average condition. The only wood frame building sale used by White from four years ago was also the lowest value per square foot at $6.84, or 55% of the weighted per square foot cost used in his valuation for the Property. The Court does not find the comparable sales constructed with more durable and lower maintenance construction and in a better overall condition than the Property to be comparable in any meaningful sense of that word. While the Court is suspect of using a four year old sale for valuation purposes, it is the only acceptable comparable sale data in evidence. White's valuation analysis, using the value of the one wood frame sale from 2006, would be:

  46,017 square feet x $6.84 per square foot = $314,756 - $50,000 = $264,756

         Rounded to $265,000

### C.  The Value of the Property for Confirmation

Based on the Court's analysis of the appraisal evidence, the Property is essentially worth the same as raw land or as improved.  However, the Debtor contemplates holding and using the property in its current condition, as improved.  Accordingly, the Court finds that the value of the Property, for purposes of confirmation, to be $265,000.

### IV.  CONCLUSION

Having determined the value of the Property under § 506(a) of the Bankruptcy Code, the Court will issue separate orders on the Bank Motion, the Hines Motion and the Landen Motion consistent with this opinion.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

ENTERED at Manchester, New Hampshire.


Date:  November 30, 2010            /s/ J. Michael Deasy
                                    J. Michael Deasy
                                    Bankruptcy Judge